| | |
|---|---|
| BRENDA K. BOYKIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM &** |
| ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the Court on the parties' cross motions for judgment on the pleadings [DE-29 & 31] and Claimant's response to the Commissioner's motion [DE-34]. Claimant, Brenda K. Boykin, seeks judicial review of the Commissioner's denial of her application for Supplemental Security Income ("SSI") benefits. After a thorough review of the record and consideration of the briefs submitted by counsel, it is recommended that Claimant's Motion for Judgment on the Pleadings [DE- 29] be granted, that the Commissioner's Motion for Judgment on the Pleadings [DE- 31] be denied, and that the case be remanded for further consideration.

## STATEMENT OF THE CASE

On February 26, 2008, Claimant protectively filed an application for SSI (R. 56), alleging disability beginning April 1, 2004, due to chronic back pain, irritable bowel syndrome, depression, leg pain, high blood pressure, and difficulty breathing (R. 171). The application was denied initially (R. 56) and upon reconsideration (R. 57). Claimant then requested a hearing before an Administrative Law Judge ("ALJ") (R. 74), which took place on November 5, 2009 (R. 29). On February 3, 2010, the ALJ issued a decision denying Claimant's application. (R. 6-

20.) On October 26, 2010, the Appeals Council denied Claimant's request for review (R. 1), which rendered the ALJ's decision a "final decision" for purposes of judicial review. *See Walls v. Barnhart*, 296 F.3d 287, 289 (4th Cir. 2002) (noting that when the Appeals Council denies a request for review, the underlying decision by the ALJ becomes the agency's final decision for purposes of appeal). Claimant then commenced this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

### I.  The Standard of Review and Social Security Framework

The scope of judicial review of a final decision regarding disability benefits under the Social Security Act, 42 U.S.C. § 405(g), is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *Walls*, 296 F.3d at 290; *see also* 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court must not weigh the evidence, as it lacks the authority to substitute its judgment for that of the Commissioner. *Walls*, 296 F.3d at 290. Thus, in determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his or her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed in a disability case. 20 C.F.R. § 416.920. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. If the claimant is not

2

engaged in substantial gainful activity, then at step two the ALJ determines whether the claimant has a severe impairment or combination of impairments which significantly limit him or her from performing basic work activities. If no severe impairment is found, the claim is denied. If the claimant has a severe impairment, at step three the ALJ determines whether the claimant's impairment meets or equals the requirements of one of the Listings of Impairments ("Listings"), 20 C.F.R. § 404, Subpart P, App. 1. If the impairment meets or equals a Listing, the person is disabled *per se*. If the impairment does not meet or equal a Listing, at step four the claimant's residual functional capacity ("RFC") is assessed to determine if the claimant can perform his or her past work despite the impairment; if so, the claim is denied. However, if the claimant cannot perform his or her past relevant work, at step five the burden shifts to the Commissioner to show that the claimant, based on his or her age, education, work experience and RFC, can perform other substantial gainful work. The Commissioner often attempts to carry its burden through the testimony of a vocational expert ("VE"), who testifies as to jobs available in the economy based on the characteristics of the claimant.

## II.     The ALJ's Findings

The ALJ proceeded through the five-step sequential evaluation process. The ALJ first found that Claimant had not engaged in substantial gainful activity since February 26, 2008, the application date. (R. 11.) The ALJ next found that Claimant suffered from the severe impairments of degenerative disc disease and chronic back pain, chronic obstructive pulmonary disease ("COPD") and tobacco abuse, sleep apnea, irritable bowel syndrome ("IBS"), history of narcotic withdrawal from prescription drugs, history of bilateral carpel tunnel syndrome, depression, and dysthymia and mood disorder. *Id.* However, at step three the ALJ determined

that Claimant's impairments did not meet or medically equal a Listing. (R. 14-15.) Next, the ALJ determined that Claimant had the RFC to perform light work with limitations. (R. 16-18.) At step four, the ALJ found that Claimant was unable to perform past relevant work. (R. 18-19.) The ALJ finally determined that there were a significant number of jobs in the national economy that Claimant could perform. (R. 19.) As a result, the ALJ found that Claimant was not disabled. (R. 20.)

### III. The Administrative Hearing

#### A. Claimant's Testimony at the Administrative Hearing

Claimant testified to the following at the November 5, 2009 administrative hearing. (R. 31-46.) At the time of the hearing, she was 46 years old and resided with her two adult sons. (R. 32-33.) Claimant completed sixth grade and is literate. *Id.* She last worked from 2003 to 2006 for her brother, who was a self-employed carpet installer. (R. 33.) Claimant prepared hand-written customer invoices, and she spent approximately 15-20 minutes once a week doing this work. (R. 34-35.) Some time prior to working for her brother, Claimant worked in home health care as a personal care assistant (R. 35) and as a dietary aide in a nursing home, where she prepared meals and cleaned the kitchen (R. 36).

Claimant testified to a number of conditions that impeded her ability to work. Her primary problem is lower back pain, which caused her to stop working as a personal care assistant because she could no longer lift the patients. (R. 37.) Her back hurts constantly, and the pain worsens with activity. (R. 38.) Claimant has problems with her legs, mostly her left leg, which are related to her back pain. *Id.* Her left leg aches and feels tired when she walks. *Id.* She cannot stand for more than ten minutes without experiencing pain in her leg, nor can she sit

4

for more than ten minutes without experiencing pain and stiffness in her back and numbness in her leg. *Id.* Changing positions helps at times, but not always. (R. 38-39.) She denied having restless leg syndrome. (R. 41-42.) Claimant also has trouble sleeping due to her pain and uses a CPAP machine. (R. 39.) Claimant's mother generally does the grocery shopping for her, because standing in line increases her back pain and she has to leave to lie down. (R. 45.)

Claimant was receiving treatment, including a number of medications, from her doctor for her pain and related problems, but stopped both her doctor visits and medications when she lost Medicaid assistance due to her youngest son turning 18 years old. (R. 39.) She did subsequently see her doctor 2-3 times for treatment from withdrawal from her medications, because her doctor indicated she would treat her free of charge out of concern for her health. (R. 40.) At the time of the hearing, Claimant was not taking any medication, despite her continued pain, apparently because she was unable to afford her medication. *Id.*

Claimant has IBS and, as a result, at times has to suddenly go to the bathroom and many times is "trapped" in the bathroom. *Id.* She also has COPD, and she experienced shortness of breath and decreased stamina. *Id.* Claimant has carpel tunnel syndrome, which mainly affects her dominant right hand and impairs her ability to hold things. (R. 41.) She has cramping in her hand when she writes "a lot." (R. 37.) Claimant felt that her ability to perform simple, repetitive tasks was limited by her physical condition. (R. 42.)

Claimant has depression, which was being treated with medication until she lost Medicaid assistance. (R. 43.) Claimant also has short term memory problems and forgets to eat or cannot remember if she ate. (R. 43-44.) At one point, Claimant was overmedicated and was frequently falling down. (R. 44.) Since she stopped taking her medications, she has not had any

5

more falling episodes. *Id.* Claimant has also had weight fluctuations, losing as much as 26 pounds in a month, and she has trouble keeping weight on. (R. 44-45.) Claimant's depression has also resulted in suicidal thoughts and many days she does not leave her home. (R. 45.)

### B. Medical Expert's Testimony at the Administrative Hearing

Dr. Helen Cannon testified as to her opinion of Claimant's medical condition. (R. 46-48.) She stated that Claimant had a diagnoses of chronic low back pain as a result of facet arthropathy, COPD with tobacco abuse, sleep apnea, and IBS. (R. 46-47.) She also indicated that there was a question as to whether Claimant had restless leg syndrome. (R. 47.) She noted that Claimant had episodes of abdominal pain with nausea and vomiting and had undergone a cholecystectomy or gall bladder surgery. *Id.* Dr. Cannon also noted Claimant's history of bilateral carpel tunnel syndrome and various psychiatric diagnoses, including depression, dysthymia, a mood disorder, and an anxiety disorder. *Id.* Dr. Cannon also testified that Claimant had a history of narcotic withdrawal from Wellbutrin, Cymbalta, Flexeril, Duragesic, and Lortab. *Id.* She noted that at one point her doctor had wanted to admit her, but that she had declined and then returned to her doctor the next day. *Id.* Dr. Cannon stated that Claimant had been overmedicated and had episodes of "falling out," which resulted in her doctor reducing her medication. *Id.* It was Dr. Cannon's opinion that Claimant's impairments did not meet or equal a Listing. (R. 48.)

### C. Vocational Expert's Testimony at the Administrative Hearing

Joy Sorio-Little, a vocational expert, testified at the administrative hearing. (R. 48-50.) The VE stated that Claimant had performed past work (1) as a home-health aide, DOT code 354.377-014, strength level medium (but very heavy as described), SVP 3; and (2) as a food

6

Case 5:10-cv-00580-D   Document 35   Filed 02/06/12   Page 6 of 14

service worker, DOT code 319.677-014, strength level medium, SVP 2. (R. 48.) The ALJ then posed the following hypothetical to the VE:

> Please assume a hypothetical individual the same age, education, relevant past work experience as the claimant. Please also assume such a person can occasionally lift twenty pounds, frequently lift ten pounds, can sit, stand, and walk six hours each in eight-hour workday, but requires a sit/stand option; is restricted to simple, routine, repetitive tasks; and requires access to a restroom. Would there be jobs in the local and national economy such a person can perform?

(R. 49.) The VE responded that such a person could person could perform the following jobs: (1) office helper, DOT code 239.567-010, strength level light, SVP 2; (2) photo copying machine operator, DOT code 207.685-014, strength level light, SVP 2; and (3) marker, DOT code 209.587-034, strength level light, SVP 2. *Id.* In response to questioning by Claimant's attorney, the VE acknowledged that a person unable to lift greater than ten pounds or who could not perform simple, routine, repetitive tasks could not perform those jobs. (R. 50.)

### IV. Claimant's Arguments

Claimant alleges the following errors by the ALJ: (1) that the RFC assessment was not supported by substantial evidence; and (2) that the opinion of Claimant's treating physician was not given controlling weight.

#### A. RFC Assessment

Claimant first contends that the she is unable to perform light work with restrictions and that the ALJ misstated the evidence and improperly assessed her credibility in reaching his conclusion. The Commissioner contends that the ALJ properly evaluated the medical record and Claimant's credibility and that his RFC assessment was supported by substantial evidence.

The ALJ concluded that Claimant could sit for six hours and stand/walk for six hours with the limitation of a sit/stand option, that she could lift ten pounds frequently and 20 pounds

7

occasionally, that she was limited to simple, routine, and repetitive tasks, and that she would require access to a restroom. (R. 16.) In reaching this conclusion, the ALJ acknowledged Claimant's testimony regarding constant back pain, complications from IBS, difficulty holding things due to carpel tunnel syndrome, sleep apnea, short-term memory problems, and depression. (R. 17.) He noted, however, that Claimant's back pain and depression were stabilized by medication, that a CPAP machine relieved her sleep apnea, and that her IBS resolved when her back pain and depression stabilized. *Id.* He also noted with regard to Claimant's COPD that her physical examinations revealed no lung problems and that she continued to smoke against medical advice. *Id.* Similarly, with regard to Claimant's carpel tunnel syndrome, the ALJ noted that physical examinations revealed she had 5/5 grip strength. *Id.*

The ALJ further considered and gave significant weight to the RFC assessment of a non-examining state agency psychological consultant, which the ALJ concluded supported a finding of "not disabled." (R. 18.) The ALJ considered and gave little weight to the opinions of non-examining state agency medical consultants, who opined that Claimant could perform medium work, because they did not have the benefit of all of the medical evidence in the record. *Id.* The ALJ gave no weight to the opinion of Claimant's treating physician, Dr. Michelle Beckham, because he found that her opinion was unclear as to what work Claimant was unable to perform, that it failed to report functional limitations, and that no RFC form was completed. (R. 17-18.)

The ALJ summarized his assessment by stating that the treating physician's medical records indicated that Claimant's impairments were stable with medications and that she was able to independently perform activities of daily living (i.e., she was able to feed, dress and undress herself, stand, speak and walk, open a door, bathe herself, drive, and did not use a cane

8

or walker). *Id.* The ALJ noted that the medical records evidenced "no ongoing treatment since September 2008." *Id.* Finally, the ALJ concluded that Claimant's complaints were not fully credible, because they were inconsistent with the medical record. *Id.*

The crux of the ALJ's RFC assessment was that Claimant's severe impairments were stable with medication. (R. 18.) However, at the time of the administrative hearing, Claimant testified that she had been without her medication since she lost her Medicaid assistance in approximately July 2008, that she was no longer taking any medication or seeing Dr. Beckham, and that she had no means to get her medication. (R. 39-40.) These statements are supported by Dr. Beckham's treatment notes (R. 406) and the absence of "ongoing treatment since September 2008," which the ALJ noted in assessing Claimant's credibility (R. 18). Thus, the ALJ failed to address a critical point, that Claimant appears to have been without medication or treatment for approximately one year prior to the administrative hearing, which undermines the ALJ's conclusion that her impairments were stable.

According to Dr. Beckham's treatment notes from July 15, 2008, Claimant "ran out of her Medicaid" and was experiencing narcotic withdrawal without medication, which at the time included Wellbutrin, Cymbalta, Flexeril, Duragesic, and Lortab for pain and depression. (R. 406.) The following day Dr. Beckham provided Claimant with samples of Celebrex for her pain and wrote a prescription for Celexa for her depression, which Claimant indicated she thought she would be able to pay for from Wal-Mart. (R. 405.) A week later she saw Dr. Beckham again for a follow-up visit and reported doing well on Celexa, but that her pain was a seven out of ten and was not controlled with Celebrex, so Dr. Beckham prescribed Lortab. (R. 404.) On August 7, 2008, Claimant saw Dr. Beckham again and was stable and doing well on the Celexa and Lortab.

9

(R. 403.) Finally, on September 9, 2008, Claimant saw Dr. Beckham for a follow-up visit and indicated the Celexa was helping, but that she was still having "a lot of pain," and Dr. Beckham increased her Lortab from twice to three times daily. (R. 402.) There are no medical records subsequent to the September 9, 2008 visit with Dr. Beckham. Claimant testified at the hearing that she could not afford to see Dr. Beckham after she lost her Medicaid and that the last 2-3 times she saw Dr. Beckham she received free treatment because Dr. Beckham was concerned about her narcotic withdrawal. (R. 40.)

The ALJ's RFC assessment was not supported by substantial evidence, because it was based on the premise that Claimant's impairments were being well controlled with medication, when in fact, as of mid to late 2008, approximately one year prior to the administrative hearing, it appears that Claimant was no longer taking any medication due to her loss of Medicaid assistance. (R. 39-40.) The failure to follow prescribed treatment, in this case taking medication, that would restore a claimant's ability to work may preclude an award of benefits. 20 C.F.R. § 416.930. However, where a claimant is unable to afford treatment or receive treatment from free community resources, the failure will be considered justifiable cause and will not preclude a finding of disability. SSR 82-59, 1982 WL 31384, at * 4 (1982).

The Fourth Circuit has explained the rationale for awarding benefits to a person who would not otherwise be disabled but for the inability to pay for treatment:

> Social security disability and SSI benefits exist to give financial assistance to disabled persons because they are without the ability to sustain themselves. It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him. Social Security Ruling 82-59 does say that inability to pay for treatment is a good reason for a refusal to follow prescribed treatment.

*Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984). The Commissioner correctly points out that SSR 82-59 requires that the claimant explore obtaining free treatment from "[a]ll possible resources (e.g., clinics, charitable and public assistance agencies, etc.)" and that "[c]ontacts with such resources and the claimant's financial circumstances must be documented." SSR 82-59, 1982 WL 31384, at *5 (1982). There is no such documentation in the record. However, SSR 82-59 also provides that a claimant must be advised that non-compliance may result in a denial of benefits and be "afforded an opportunity to undergo the prescribed treatment or to show justifiable cause for failing to do so." *Id.* There is no evidence in the record that Claimant was provided such an opportunity, which constitutes grounds for remand. *See Gordon*, 725 F.2d 231 at 237 (remanding case for claimant to be given the opportunity to show cause for failing to obtain treatment); *Wilkins v. Astrue*, No. 3:10-cv-637, 2011 WL 6440296, at *5-6 (W.D.N.C. Nov. 22, 2011) (recommending remand where the record showed that claimant was unable to afford medication and ALJ concluded that Plaintiff was not disabled if he was compliant with his medication), *adopted by* 2011 WL 6440290 (W.D.N.C. Dec. 21, 2011).

Therefore, it is recommended that the case be remanded for further development of the record, in accordance with SSR 82-59, and for reconsideration of Claimant's RFC in light of Claimant's loss of medications and treatment due to her alleged inability to pay.[1]

**B.  Treating Physician's Opinion**

Claimant also contends that the ALJ erred in not giving controlling weight to her treating physician's opinion. The Commissioner contends that the opinion was not supported by medical

---

[1] It appears that the ALJ believed Claimant's chronic pain was stable with medication as of August 2008. (R. 17.) However, it is less clear whether he believed Claimant's condition was stable before that time, as he notes intermittent stability and increased pain from 2006-2008 (R. 13-14 &17). In the event the case is remanded, there may be, depending on how the loss of medication issue is resolved, a need for clarification of the ALJ's opinion on when Claimant's condition was stabilized.

11

evidence and inconsistent with the record. The ALJ properly considered Dr. Beckham's opinion and his decision to afford it no weight was supported by substantial evidence.

Under the Commissioner's regulations, controlling weight is given to the opinion of a treating source on the issues of the nature and severity of an impairment if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. 20 C.F.R. § 416.927(d)(2). "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1995). Additionally, the ALJ is not bound by a treating physician's opinion regarding whether a claimant is "disabled" or "unable to work," as such decisions are reserved for the Commissioner. 20 C.F.R. § 416.927(e)(1).

Dr. Beckham's November 1, 2006 letter stated that Claimant had been her patient since 2003 and that she had suffered from chronic low back pain throughout her treatment, noting Claimant's diagnoses of facet arthropathy and sacroiliac joint dysfunction. Dr. Beckham described Claimant's pain as debilitating and noted that she required large amounts of pain medication to function. Dr. Beckham stated that Claimant had been unable to work for several years. Dr. Beckham also noted that she was also treating Claimant for depression, headaches, and COPD. Dr. Beckham opined that Claimant's medical problems limit her ability to stand for long periods and lift greater than 10 pounds and that, due to her history of carpel tunnel syndrome, she has difficulty with repetitive motions in her hands, even at light weights. Dr. Beckham concluded that "[a]t this point in time, it appears that she is unable to work. (R. 413.)

The ALJ stated that Dr. Beckham's opinion was "unclear what work the claimant is unable to perform and no functional limitations reported or Residual Functional Capacity Forms completed." (R. 17.) Additionally, the ALJ found the opinion to be contrary to subsequent treatment records indicating that Claimant's impairments were stable. *Id.*

Claimant contends that Dr. Beckham's statement that Claimant was unable to work was clear. However, the ALJ is not required to give such a statement any weight, as the determination of a claimant's ability to work is reserved for the commissioner. 20 C.F.R. § 416.927(e)(1).

Claimant correctly points out that Dr. Beckham did report functional limitations, specifically Claimant's limited ability to stand for long periods and to lift greater than 10 pounds, and her difficulty with repetitive motions in her hands, even at light weights. However, there is no support in Dr. Beckham's treatment notes for such functional limitations, as was noted by the ALJ, and there is medical evidence to contradict these findings. For example, with respect to Claimant's carpel tunnel, it was noted during a December 20, 2006 consultative examination that Claimant was using a brace on her right hand, but that after it was removed she was able to "make a fist very tightly." (R. 221.) Furthermore, in the ALJ's RFC assessment, he stated in reference to Claimant's carpel tunnel syndrome that "physical examination revealed she had 5/5 grip strength (Exhibits 3F, 8F, 12F and 16F)." (R. 17.) Lastly, Claimant has cited no instance in her treatment records where Dr. Beckham noted limitations on Claimant's ability to stand or lift like the ones in her opinion letter.

Therefore, The ALJ properly considered Dr. Beckham's opinion and his decision was supported by substantial evidence.

13

## CONCLUSION

It is **RECOMMENDED** that Claimant's motion for judgment on the pleadings [DE-29] be **GRANTED** that the Commissioner's motion for judgment on the pleadings [DE-31] be **DENIED**, and that the case be **REMANDED** for further consideration consistent with this Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 6th day of February, 2012.

DAVID W. DANIEL
UNITED STATES MAGISTRATE JUDGE